**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KRISTEN STROMBERG CHILDERS,** | : | |
| **Ph.D** | : | |
| *Plaintiff*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TRUSTEES OF THE UNIVERSITY OF** | : | |
| **PENNSYLVANIA,** | : | **No. 14-2439** |
| *Defendant*. | : | |

<u>**MEMORANDUM**</u>

PRATTER, J.                                                                                    MARCH 21, 2016

Kristen Stromberg Childers was an assistant professor of history at the University of Pennsylvania ("Penn") who was twice denied tenure. She claims that the second tenure denial was a result of gender discrimination, and more specifically, that she did not achieve tenure because of stereotypes relating to the career focus of women with child care responsibilities (*i.e.*, family responsibility discrimination). She filed suit against Penn under Title VII, the PHRA, and the Philadelphia Fair Practices Ordinance. Penn has moved for summary judgment, arguing that Dr. Childers has not even set forth a *prima facie* case of discrimination, let alone shown that Penn's legitimate non-discriminatory reasons for not granting her tenure were pretextual. Penn also moves to exclude one of Dr. Childers's expert witnesses. The Court heard oral argument on the motions and allowed both parties to submit supplemental briefing. After reviewing the motions and all responses and supplements thereto, the Court will grant Penn's *Daubert* motion and deny Penn's motion for summary judgment.

**BACKGROUND**[1]

The following is a general outline of the tenure process at Penn and Dr. Childers's career path, as well as a discussion of Dr. Childers's tenure applications.

Tenure Process

Penn consists of twelve schools, including the School of Arts & Sciences ("SAS"), of which the History Department is a part.  Assistant professors in SAS have a seven-year probationary period, and in year six of that period there is a mandatory review for promotion. Assistant professors may extend the "tenure clock" if a child is born or adopted into the faculty member's household.

The tenure review process starts in the faculty member's department.  That department solicits confidential recommendations from external reviewers, who are faculty members in the same field as the applicant at other universities.  A three-person committee within the department reviews the external reviews and the candidate's dossier and then makes a recommendation concerning tenure to the department chairperson.  The tenured faculty then meet to discuss the candidate and vote on a recommendation to be made to the Dean of SAS.  If the vote is in the candidate's favor, the department chairperson forwards the tenure case to the Dean.

Before the Dean assesses the case, however, the SAS Personnel Committee reviews it. The SAS Personnel Committee is made up of members from three disciplines (Humanities, Social Sciences, and Natural Sciences), and has a subpanel for each of the three disciplines.  The subpanel with which the department submitting the candidate is aligned (for History, that is the Humanities subpanel) reviews the tenure case first and votes on the candidate, and then the entire

---

[1] Due to the parties' confidentiality agreement, portions of their summary judgment arguments and of the record have been filed under seal.  The Court will avoid using specific details, so as not to disturb the parties' agreement, which was approved by the Court.  *See* Docket No. 37.

Personnel Committee discusses and votes on the candidate.  If the Personnel Committee vote is positive, the chair of the Personnel Committee writes to the Dean with the Committee's recommendation.

Once the Dean receives the case from both the department and the Personnel Committee, the Dean forwards the case to the Provost with the Dean's own recommendation.  The Provost then meets to discuss the case with the Provost Staff Conference, which consists of the deans from Penn's four largest schools, four deans from other schools on a rotating basis, and vice provosts for education, faculty affairs, and research.  At the meeting, the Dean in question presents the case to the Provost Staff Conference and then leaves the room while the Conference discusses the candidate.  Following the meeting, the Provost makes a decision on tenure.  If the Provost decides in favor of the candidate, the candidate is presented to the University's Trustees for the final decision on tenure.

<u>Dr. Childers</u>

Dr. Childers earned her Ph.D. from Penn in 1998.  She then taught at area schools such as Bryn Mawr, Swarthmore, and Rutgers before becoming an assistant professor at Penn in the spring of 2002.  Dr. Childers's area of specialty is 20th century France, and, in particular, the Vichy period.  She focuses her scholarship on gender, family history, social policy, colonialism, and decolonization.  Her first book, *Fathers, Families and the State, 1914-1945*, was published by Cornell University Press in 2003.  Her second, *Seeking Imperialism's Embrace: National Identity, Decolonization, and Assimilation in the French Caribbean*, is pending publication by Oxford University Press.  In the spring of 2004, Dr. Childers took a leave of absence relating to the birth of her first child.  She then took a full year of "junior leave" during the 2005-06 school year, meaning that she was relieved of all teaching responsibilities in order to allow her to focus

on research and publication.  In 2007-08, Dr. Childers took a half-time teaching arrangement due to the birth of her second child, and in 2008-09, she again took a half-time teaching arrangement due to her first child's autism diagnosis.

Dr. Childers was first considered for tenure in early 2008.  The History Department faculty voted 21-11 in favor of tenure, but the Personnel Committee voted 9-0 (with one abstention) against tenure, noting concerns with Dr. Childers's scholarly productivity following the 2003 publication of her first book.  After this denial, Dr. Childers requested a one-year extension of her probationary period.  The department approved that extension and allowed her to present a new tenure case in the 2009-10 academic year.

Because more than a year had elapsed since her first go at tenure, Dr. Childers prepared a completely new tenure dossier and the department also reviewed her candidacy anew.  At this time, her second book, while still unpublished, had been accepted by Oxford University Press and four of six chapters had been completed.  Ten external reviewers were asked to provide letters, and six of those ten submitted letters.  This time, the History Department voted 26-5 in her favor, with one abstention.  The Humanities Subpanel split 2-2 on the question of Dr. Childers's candidacy and expressed concern about her productivity and reputation in the field. The Subpanel was informed about Dr. Childers's leave and the reasons for that leave, and some of the questions the Subpanel submitted to the History Department Chair related to Dr. Childers's leave.  The History Department Chair, Professor Peiss, responded by elaborating on the reasons for Dr. Childers's leave, including informing the Subpanel of the child's autism diagnosis.  The full Personnel Committee then voted in favor of Dr. Childers's candidacy, 7-4, while still expressing concerns about her level of productivity and visibility in her field, noting in

particular concerns about her lack of travel to the French and Caribbean venues important to her work.

SAS Dean Bushnell then forwarded the case to the Provost and Provost Staff Conference, with a letter of support that noted the difficulty in assessing Dr. Childers's productivity in light of her family leave.  After the Dean presented the case to the Provost Staff Conference, the Conference discussed Dr. Childers's case and advised against a grant of tenure.  Provost Vincent Price agreed with that recommendation and decided against granting Dr. Childers tenure.

In October 2010, Dr. Childers filed a grievance regarding the Provost's decision to deny her tenure, claiming that the decision was based on her gender and her prior family leaves and arguing that the comments regarding her leave in the various letters prepared in support of her tenure case were not in compliance with University procedures.  A three-member Faculty Grievance Commission was empaneled.  At first, the Commission consisted of two men and one woman, but Penn exercised a peremptory strike to remove the female member of the Commission, who was then replaced by a man, against Dr. Childers's objections.  The Faculty Grievance Commission conducted a review of the case and held a two-day hearing.  They concluded that the references to leaves of absence did not comply with University policy and "unfairly amplified the issue of Dr. Childers's leave time on her productivity," but at the same time found no evidence of discrimination.  Because of the irregularities, the Commission recommended that Dr. Childers's case be reevaluated.  They also recommended that the ultimate decision-maker be someone other than the Provost and that the committee assisting in evaluating the dossier be composed of members who had not previously evaluated her case.

The Provost accepted the reevaluation recommendation, but did not recuse himself from the case or ensure that the Conference not contain members who had previously evaluated Dr.

Childers's candidacy.  After redacting references to her leave from the dossier, the Provost and the Provost Staff Conference reconsidered the case and arrived at the same conclusion, noting concerns with Dr. Childers's productivity and scholarship.

<u>Comparators</u>

Penn points out that in 2007-08, the year Dr. Childers was first considered for tenure, two SAS professors eligible for tenure had taken faculty parental leave and nine had received child-related tenure extensions (five men and four women).  Two of those women received tenure, and two, including Dr. Childers, did not.  One male candidate withdrew himself from consideration, one received tenure, and the remaining three men did not.  In 2009-10, nine SAS professors eligible for tenure review took faculty parental leave (eight women and one man).  The male professor achieved tenure.  Three of the female professors waived review, and four of the remaining five were awarded tenure (only Dr. Childers did not).  That same year, nine SAS professors eligible for tenure received child-related extensions of the tenure review period (seven women and two men).  One male candidate waived review, and the other earned tenure.  Three of the female candidates waived review, three achieved tenure, and the last (Dr. Childers) did not.

Dr. Childers expands the time period for comparators to the span of two years before she first sought tenure through two years after, and then refers to an expert report by Dr. Robert Kreiser examining each potential comparator.  Dr. Childers points to other history department and SAS faculty that were either women without childcare responsibilities and/or leaves or men who, according to Dr. Childers, had publishing records similar to her own and who did earn tenure.  Some of these comparators also had external reviewers who declined to write letters and/or criticized the candidate's productivity and scholarship, and one (a male) received a vote in

the History Department which was less favorable than Dr. Childers's second tenure vote in the department.

Procedural History

Dr. Childers filed her Complaint in April, 2014, alleging that Penn violated Title VII, the PHRA, and the Philadelphia Fair Practices Ordinance when it failed to promote her to the position of tenured Associate Professor because of her gender.  After discovery, Penn filed the instant motion for summary judgment, as well as a *Daubert* motion challenging one of Dr. Childers's experts.  Dr. Childers opposes both motions.

LEGAL STANDARD

**A. *Daubert* Motions**

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court, in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), imposed upon district courts the role of a gatekeeper, charging trial courts to "ensure that any and all scientific evidence is not only relevant, but reliable."  *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.,* 198 F. Supp. 2d 598, 601–02 (E.D. Pa. 2002) (quoting *Daubert*, 509 U.S. at 589).  When "faced with a proffer of expert scientific testimony . . . the trial judge must

determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue." *Id.* at 602 (quoting *Daubert,* 509 U.S. at 592).  The gatekeeping function of the district court includes not just scientific testimony but also "testimony based on . . . 'technical' and 'other specialized' knowledge."  *Id.* (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999)).

### B.  Motions for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322. Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the opposing party.  *Anderson*, 477 U.S. at 255.

DISCUSSION

A. *Daubert* **Motion**

Dr. Childers offers two experts, one on tenure and the other on gender stereotyping and social framework analysis.  Penn challenges the report of the latter expert, Dr. Jane Halpert.  Dr. Halpert's opinion focuses on the social science of stereotyping, and in particular how stereotypes of women with childcare responsibilities affect those women in the workplace.  She starts by generally setting forth a framework for what stereotypes are and how they can affect assessments of individual behavior once an individual is identified as a member of a stereotyped group.  She then examines settings or conditions conducive to stereotyping and points to the characteristics of the Penn tenure process that she believes could have opened the door to stereotyping (*e.g.*, lack of Human Resources involvement in the tenure process, the voluntary nature of gender bias workshops, emphasis on leave in Dr. Childers's tenure file, a lack of specific/objective standards for tenure).

Penn characterizes the report as general observations coupled with unfounded speculation regarding the existence of bias in this particular case.  It argues that Dr. Halpert did not look at key information, including data reflecting Penn's record of promoting women with childcare responsibilities or the dossiers of Dr. Childers and her comparators, or examine what stereotypes might have been held by the Penn employees involved in Dr. Childers's tenure review, but rather only looked at documents and deposition testimony selected by Plaintiff's counsel and made assumptions about the composition of the History Department.  Penn highlights uncertainties expressed by Dr. Halpert in her deposition and concludes that Dr. Halpert's report should be excluded because she does not opine as to whether Dr. Childers's gender and family status had

an effect on the tenure decision in this case.[2]  Penn also argues that Dr. Halpert did not rely on any particular methodology in setting forth her opinion in this case – while she reviewed the literature on stereotyping, she did not, for instance, survey the attitudes of the individuals involved in Dr. Childers's tenure decision to see if any bias was present.  Instead, Penn argues, Dr. Halpert merely "dog-eared" passages from documents and depositions that supported Dr. Childers's theory of the case and raised issues with the tenure process at Penn which she was not qualified to raise, due to her lack of expertise in how tenure decisions are made.  Because of all these flaws, Penn argues that Dr. Halpert's testimony will not be helpful to the jury.

Dr. Childers counters that testimony of this type has been admitted in many other cases, and that Dr. Halpert's failure to opine as to the ultimate issues in this case is a strength rather than a weakness of her testimony, in that the ultimate issue of whether gender bias caused Dr. Childers's tenure denial is for the jury.  It notes that Penn cites to cases in which social science experts were excluded because they did try to opine as to things like the mindset of decisionmakers (*see, e.g., Chadwick v. Wellpoint, Inc.*, 550 F. Supp. 2d 140 (D. Me. 2008)), whereas Dr. Halpert rightfully leaves those issues to the jury.  Dr. Childers explains that Dr. Halpert did not endeavor to provide the jury with an empirical analysis, but rather to aid the jury in explaining what stereotyping is and what factors make it more or less likely to have played a role.

Courts are divided about whether testimony of this type is admissible or not.  On the one hand, those that exclude it tend to reason that general testimony on stereotyping does not "fit" the case closely enough and that laboratory findings about unconscious stereotyping are too far

---

[2] Penn claims that Dr. Halpert stated in her report that gender may have played a significant factor in the tenure decision but then recanted at deposition.  Dr. Childers argues that Dr. Halpert merely admitted at deposition that "significant" was a term of art, that she did not intend to use it as such, and that the word "important" or something like that could be substituted for "significant."

removed from carefully considered employment decisions to be helpful to juries.  *See, e.g.,*

*Karlo v. Pittsburgh Glass Works, LLC*, 2:10-cv-1283, 2015 WL 4232600 (W.D. Pa. July 13,

2015).  They also draw distinctions between unconscious stereotyping and "intentional

discrimination" required to make out a Title VII claim and exclude experts who only opine as to

stereotyping that may be subconscious, s*ee, e.g., E.E.O.C. v. Wal-Mart Stores, Inc.*, Civil Action

No. 6:01-CV-339-KKC, 2010 WL 583681, at \*3-4 (E.D. Ky. Feb. 16, 2010),[3] and require social

framework experts to at least present a reliable methodology that consists of more than "'dog-

earing' passages from depositions that [the expert] believed supported his conclusions," *see*

*EEOC v. Bloomberg L.P.*, No. 07-8383, 2010 WL 3466370, at \*16 (S.D.N.Y. Aug. 31, 2015).

On the other hand, courts that allow social stereotyping testimony note that jurors are not

necessarily knowledgeable about stereotyping and what factors can facilitate impermissible

stereotyping and hold that the testimony can give jurors a context within which to evaluate the

evidence.  *See, e.g., Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208 (D. Mass.

2009); *Merrill v. M.I.T.C.H. Charter Sch. Tigard*, 2001 WL 1457461 (D. Or. Apr. 4, 2011)

(declining to exclude Dr. Halpert).

Here, the Court finds the reasoning applied in at least some of the cases excluding social

framework experts compelling and the facts in cases allowing the testimony distinguishable.

Without reviewing data such as information relating to similarly-situated individuals, Dr.

Halpert's testimony is not based on a sufficient record to support her conclusions.  Much like the

expert excluded in *Bloomberg*, 2010 WL 3466370, Dr. Halpert's methodology of sifting through

---

[3] Dr. Childers argues that the emphasis in these cases on distinguishing "intentional discrimination" from unconscious stereotyping is misplaced, citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) for the proposition that employment decisions made on the basis of sex stereotypes are impermissible.  While it does appear that at least some of the cases excluding social framework experts view "intentional discrimination" too narrowly, that does not mean that *any* testimony relating to stereotyping must be admissible.

evidence to find passages that support the Plaintiff's theory of the case does not meet Rule 702's requirement of reliability.  The Court also finds that Dr. Halpert's analysis of the tenure process at Penn to be beyond her expertise, unlike the analysis of the expert in *Tuli*, 592 F. Supp. 2d 208, who opined much more generally about stereotyping.  Because of these flaws and because stereotypes of women in the workplace are well within a layperson's common knowledge, Dr. Halpert's testimony will not help the trier of fact, and may even cause confusion, given how speculative her conclusions about the tenure process at Penn, in general and as to Dr. Childers, are.  Thus, the Court will grant Penn's *Daubert* motion.

### B.  Motion for Summary Judgment

Because Dr. Childers does not claim to have direct evidence of gender discrimination, the case will be analyzed in the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[4]  Under *McDonnell Douglas,* a plaintiff may establish a *prima facie* discrimination claim by showing that (1) she belongs to a protected class; (2) she was qualified for a position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances that raise an inference of discrimination.  *See Sarullo v. United States Postal Serv.,* 352 F.3d 789, 797 (3d Cir.2003).

If a plaintiff establishes a *prima facie* case of discrimination, the defendant must "articulate some legitimate, nondiscriminatory [or non-retaliatory] reason for the adverse employment action."  *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 370 (3d Cir. 2008).  The plaintiff then has the burden of showing that the defendant's proffered reasons for the adverse action are pretextual.  At the summary judgment stage, the plaintiff must meet this burden by

---

[4] Claims under Title VII, the PHRA, and the Philadelphia Fair Practices Ordinance are analyzed under the same burden-shifting framework.  *See Gomez v. Allegheny Health Servs., Inc.,* 71 F.3d 1079, 1083–84 (3d Cir. 1995); *Hong v. Temple Univ.*, No. CIV. A. 98-4899, 2000 WL 694764, at *9 (E.D. Pa. May 30, 2000).

submitting "evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination [or retaliation] was more likely than not a motivating or determinative cause of the employee's termination." *Id.* (citing *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met–Pro Corp.,* 412 F.3d 463, 467 (3d Cir. 2005). Finally, in deciding a dispositive motion under the *McDonnell Douglas* framework, the Court recognizes that "evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires [the Court] to ration the evidence between one stage or the other." *Doe*, 527 F.3d at 370.

In the context of tenure decisions, the Third Circuit Court of Appeals has cautioned that district courts should not "substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure." *See Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980). However, in *Kunda* and in subsequent cases, the Third Circuit Court of Appeals has made abundantly clear that this admonition does not create a higher burden for plaintiffs complaining of discrimination in the tenure process, nor does it shield universities from the Court's scrutiny. *See, e.g., Bennun v. Rutgers State Univ.*, 941 F.2d 154 (3d Cir. 1991) (upholding district court's finding of racial discrimination in denying the plaintiff tenure).

Penn first argues that Dr. Childers has failed to set forth a *prima facie* case of discrimination. Penn focuses on the fourth prong of the *prima facie* case and argues that there is no evidence in this case that would create an inference of discrimination, in that there are no similarly-situated professors who were treated more favorably that Dr. Childers was. Instead of

13

comparing Dr. Childers to SAS professors who were either women with no childcare responsibilities or men (with or without childcare responsibilities), Penn lists her comparators as only those professors who took parental leave or received child-related extensions of the tenure clock.  Penn argues that other women who had childcare responsibilities in their records did receive tenure and that some men with childcare responsibilities did not receive tenure. However, Penn does not go into enough detail about these supposed comparators' qualifications in its briefing to draw meaningful comparisons between them and Dr. Childers, and it does not cite any case law for the proposition that showing that similarly-situated individuals in the *same* protected class are treated well negates a *prima facie* case or that showing that similarly-situated individuals who are not class members and are treated the same as the plaintiff has any bearing on the *prima facie* case at the summary judgment stage.  Penn does point to at least two male candidates for tenure who received tenure despite child-related extensions, so without more information about why (or if) they were more qualified than Dr. Childers, these comparators alone would seem to *support* Dr. Childers's *prima facie* case.

For her part, Dr. Childers argues that she does not even need to show that similarly-situated individuals received better treatment to set out a *prima facie* case.  Rather, she argues that here, there is enough evidence to raise an inference of discrimination in the many comments made in tenure-related documents about her family situation and responsibilities.  Nonetheless, when discussing pretext (Penn's next argument) and in her supplemental briefing, Dr. Childers refers to the expert report of Dr. Kreiser, which proffers a variety of comparators.  For example, Dr. Childers points to a male candidate for tenure who had less favorable History Department support than she did, about whom productivity concerns were raised, and who still received tenure.  Other comparators, such as women without family leave who received tenure and may

have been judged less harshly than Dr. Childers, are also highlighted.  Between the excessive commentary about her family situation in the tenure review record and the existence of potential similarly situated comparators who were treated more favorably than Dr. Childers, the Court concludes that she has at least set forth a *prima facie* case of discrimination.

Penn also argues that it has proffered legitimate nondiscriminatory reasons for Dr. Childers's tenure denial, and that Dr. Childers cannot show that this reason was a pretext for discrimination.  The legitimate reasons include insufficient productivity, scholarly impact, and visibility.  More specifically, Penn cites Dr. Childers's failure to publish sufficient articles and speak at conferences, the failure of 4 of 10 external reviewers to submit reviews, the criticisms voiced by the external reviewers who did submit letters, and the lack of unequivocal support from the History Department and Personnel Committee.  Penn argues that the four History Department professors who received tenure between 2006 and 2010 all had stronger records than Dr. Childers did, and that even the one other failed candidate (a male professor) had a stronger record than Dr. Childers.

Dr. Childers does not argue that Penn has failed to proffer a legitimate non-discriminatory reason for her tenure denial, but she does argue that she proffers more than enough evidence to show pretext.  She points to the fact that her family situation was widely discussed throughout the process, so much so that the Grievance Commission specifically found that her leaves were discussed in an inappropriate level of detail and granted her a reevaluation with the excess discussion of leave redacted from her dossier.  Penn counters that any comments about Dr. Childers's leave were there to put her productivity in context, *i.e.*, to help her, not to raise unfair stereotypes.  In arguing this, however, Penn misses the point that the intentions behind the comments are not dispositive if the comments colored the process by which Dr.

15

Childers was judged as a tenure candidate by causing those receiving the information to unfairly stereotype Dr. Childers and injecting those stereotypes into the decisionmaking process.

As previously discussed, Dr. Childers also points to other successful tenure candidates outside of her protected class who she claims had similar publication records, and she notes that her productivity was not a concern for external reviewers or the History Department itself, which sets standards that are more book-focused than article-focused.  She points to other comparators who did not receive reviews from every external reviewer solicited, and notes that this fact was not held against them in the same way it was highlighted in her dossier, nor was the weight of external reviews discounted for candidates whose reviewers had personal relationships with them.  She claims that negative criticism in other candidates' external reviews was glossed over, even when it was more damning than any of the negative commentary in her reviews.

In response, Penn argues that Dr. Kreiser's report, which Dr. Childers cites for an evaluation of comparators, does not identify which of the comparators took family leave. However, in Dr. Childers's counterstatement of facts (to which Penn never directly responded in a paragraph by paragraph fashion), Dr. Childers does at least clarify that the women she asserts are comparators did not have children at the time they were reviewed for tenure.  Penn also argues in supplemental briefing that Dr. Childers failed to show that her comparators were similarly situated because she did not show that the decisionmakers were the same.  Penn points to at least one of Dr. Childers's proffered comparators, who was reviewed by different professors throughout the process, including a different provost.  However, whether an individual is similarly situated to a plaintiff is a fact-intensive and case-specific inquiry, and the identity of the decisionmaker(s) is but one factor in determining whether a comparator is sufficiently similarly situated or not.  *See Bennun*, 941 F.2d at 178-79 (refusing to "change 'similarly situated' to

'identically situated,'" and upholding a comparison between two tenure candidates who had at least partially different reviewing committees, as well as different emphases (research-oriented versus teaching-oriented)).

The Court finds that issues of material fact, in particular whether certain individuals are similarly situated to Dr. Childers, pervade this case.  Those issues have a direct bearing on the credibility of Penn's proffered legitimate non-discriminatory reason for refusing Dr. Childers's bid for tenure.  Thus, the Court will deny summary judgment.

**CONCLUSION**

For the foregoing reasons, the Court will grant Penn's *Daubert* motion and deny Penn's Motion for Summary Judgment.  An appropriate Order follows.


BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge

17